(Slip Opinion) OCTOBER TERM, 2024 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## CATHOLIC CHARITIES BUREAU, INC., ET AL. *v.* WISCONSIN LABOR AND INDUSTRY REVIEW COMMISSION ET AL.

### CERTIORARI TO THE SUPREME COURT OF WISCONSIN

No. 24–154. Argued March 31, 2025—Decided June 5, 2025

Wisconsin law exempts certain religious organizations from paying unemployment compensation taxes. The relevant statute exempts nonprofit organizations "operated primarily for religious purposes" and "operated, supervised, controlled, or principally supported by a church or convention or association of churches." Wis. Stat. §108.02(15)(h)(2). Petitioners, Catholic Charities Bureau, Inc., and four of its subentities, sought this exemption as organizations controlled by the Roman Catholic Diocese of Superior, Wisconsin. The Wisconsin Supreme Court denied the exemption, holding that petitioners were not "operated primarily for religious purposes" because they neither engaged in proselytization nor limited their charitable services to Catholics.

*Held*: The Wisconsin Supreme Court's application of §108.02(15)(h)(2) to petitioners violates the First Amendment. Pp. 7–15.

(a) The First Amendment mandates government neutrality between religions and subjects any state-sponsored denominational preference to strict scrutiny. The Wisconsin Supreme Court's interpretation of §108.02(15)(h)(2) imposes a denominational preference by differentiating between religions based on theological lines. Petitioners' eligibility for the exemption ultimately turns on inherently religious choices (namely, whether to proselytize or serve only co-religionists in the course of charitable work), not "'secular criteria'" that "happen to have a 'disparate impact' upon different religious organizations." *Larson* v. *Valente*, 456 U. S. 228, 247, n. 33. Because that regime explicitly differentiates between religions based on theological practices, strict scrutiny applies. Pp. 8–11.

(b) The State argues that, when it comes to religious accommodations afforded by the government, courts should ask whether the accommodation's eligibility criteria are the product of "invidious discrimination" to determine if strict scrutiny applies. In support of that rule, the State draws on *Gillette* v. *United States*, 401 U. S. 437. *Gillette*, however, is inapposite. Unlike the conscientious objector status in *Gillette*, which was equally available to members of all religions, the Wisconsin Supreme Court's interpretation of §108.02(15)(h)(2) facially differentiates among religions based on inherently theological choices. The State next disputes the premise that petitioners were denied coverage because they do not proselytize or serve only Catholics in the course of performing charitable work. The State instead claims that petitioners were excluded because they engaged in no "distinctively religious activity," meaning "activities that express and inculcate religious doctrine." Tr. of Oral Arg. 81. That understanding of the Wisconsin Supreme Court's ruling, even if assumed correct, cannot save the statute from strict scrutiny because decisions about whether to "express and inculcate religious doctrine" while performing charitable work are fundamentally theological choices driven by religious doctrine. Pp. 11–13.

(c) Section 108.02(15)(h)(2), as applied, cannot survive strict scrutiny because the State has not met its burden to show that the law's application is narrowly tailored to further a compelling government interest. Wisconsin contends that the exemption advances two principal interests. First, it argues that the law serves a compelling state interest in ensuring unemployment coverage for its citizens. The State, however, has failed to demonstrate that the theological lines drawn by the statute are narrowly tailored to advance that interest, particularly as applied to petitioners. Indeed, petitioners operate their own unemployment compensation system, which provides benefits largely equivalent to the state system. The distinctions drawn by Wisconsin's regime, moreover, are underinclusive, exempting religious entities that provide similar services (*i.e.*, without proselytizing or serving only co-religionists) when the work is done directly by a church. Second, the State asserts an interest in avoiding entanglement with employment decisions based on religious doctrine. Resolving misconduct disputes for employees tasked with inculcating religious faith, the State argues, may require it to decide whether those employees complied with religious doctrine. The lines drawn by the exemption, however, are overinclusive in relation to that interest, for they operate at the organizational level, covering employees that do and do not inculcate religious doctrine in equal measure. This poor fit between the State's asserted interests and the distinctions drawn cannot satisfy strict scrutiny. Pp. 13–15.

Syllabus

2024 WI 13, 411 Wis. 2d 1, 3 N. W. 3d 666, reversed and remanded.

SOTOMAYOR, J., delivered the opinion for a unanimous Court. THOMAS, J., and JACKSON, J., filed concurring opinions.

NOTICE: This opinion is subject to formal revision before publication in the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

─────────────

No. 24–154

─────────────

## CATHOLIC CHARITIES BUREAU, INC., ET AL., PETITIONERS *v.* WISCONSIN LABOR & INDUSTRY REVIEW COMMISSION, ET AL.

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF WISCONSIN

[June 5, 2025]

JUSTICE SOTOMAYOR delivered the opinion of the Court.

Wisconsin, like many other States, exempts certain religious organizations from paying taxes into the State's unemployment compensation system. One such exemption covers nonprofits "operated primarily for religious purposes" and controlled, supervised, or principally supported by a church. Wis. Stat. §108.02(15)(h)(2) (2023–2024). Petitioners, Catholic Charities Bureau, Inc., and four of the entities that it operates, claimed that they qualify for the exemption as religious organizations controlled by the Roman Catholic Diocese of Superior, Wisconsin. The Wisconsin Supreme Court disagreed, holding that petitioners are not "operated primarily for religious purposes" because they neither engage in proselytization nor serve only Catholics in their charitable work.

The question here is whether §108.02(15)(h)(2), as applied to petitioners by the Wisconsin Supreme Court, violates the First Amendment. The Court holds that it does. The First Amendment mandates government neutrality be-

tween religions and subjects any state-sponsored denominational preference to strict scrutiny. The Wisconsin Supreme Court's application of §108.02(15)(h)(2) imposed a denominational preference by differentiating between religions based on theological lines. Because the law's application does not survive strict scrutiny, it cannot stand.

I

A

Wisconsin has long operated an unemployment compensation program that seeks to mitigate and "more fairly" distribute the "economic burdens resulting from unemployment." Wis. Stat. §108.01(2); see §108.01 *et seq*. To achieve that goal, Wisconsin law requires most employers to make regular contributions to the State's unemployment fund through payroll taxes. See §§108.17–108.18. Nonprofit employers may choose between contributing to that fund and reimbursing the State for benefits paid to their laid-off employees. See §108.151.

Wisconsin's regime contains an exemption for religious employers. See §108.02(15)(h). The exemption applies to any "church or convention or association of churches," without further qualification, and to services provided "[b]y a duly ordained, commissioned or licensed minister of a church in the exercise of his or her ministry or by a member of a religious order in the exercise of duties required by such order." §§108.02(15)(h)(1), (3). As relevant here, the exemption also covers nonprofit organizations "operated, supervised, controlled, or principally supported by a church or convention or association of churches," but only if they are "operated       primarily       for       religious       purposes." §108.02(15)(h)(2).

Wisconsin is not alone in exempting religious organizations from unemployment compensation taxes. The Federal Unemployment Tax Act, 26 U. S. C. §3301 *et seq*., contains a textually parallel religious-employer exemption.

See §3309(b)(1)(B).  Since Congress enacted that law in 1970, over 40 States have adopted similar exemptions.[1]

B

Catholic Charities Bureau, Inc., (Bureau), is a nonprofit organization that serves as the social ministry arm of the Roman Catholic Diocese of Superior, Wisconsin.  2024 WI 13, ¶4, 411 Wis. 2d 1, 13, 3 N. W. 3d 666, 672.  The Bureau's stated mission is to "carry on the redeeming work of our Lord."  App. to Pet. for Cert. 382a.  In aid of that mission, the Bureau "provid[es] services to the poor and disadvantaged" and seeks to "be an effective sign of the charity of Christ."  *Id.*, at 383a.  It does not distinguish on the basis of "race, sex, or religion in reference to clients served, staff employed and board members appointed."  *Ibid.*

The Bureau oversees several separately incorporated entities, including four that, together with the Bureau, are the petitioners here: Barron County Development Services, Inc., Black River Industries, Inc., Diversified Services, Inc., and Headwaters, Inc.  411 Wis. 2d, at 14–16, 3 N. W. 3d, at 672–673.  These entities provide a range of charitable services to local communities across Wisconsin.  Barron County Development Services, for instance, helps individuals with disabilities secure employment.  See *id.*, at 14, 3 N. W. 3d, at 673.  Black River Industries provides daily living services to Wisconsinites with developmental or mental health disabilities, among other charitable services.  *Id.*, at 15, 3 N. W. 3d, at 673.

The Roman Catholic Diocese of Superior exercises control over both the Bureau and its subentities.  *Id.*, at 14, 3 N. W. 3d, at 672.  The bishop of the Diocese serves as the Bureau's

—————

[1] Wisconsin does not cite any decisions interpreting these federal or state laws to require proselytization or exclusively co-religionist service for charitable organizations to qualify for the exemption, as the Wisconsin Supreme Court did here.  See *infra,* at 9–10.

president and appoints its membership, which in turn over-sees the Bureau "'to ensure'" that it fulfills its mission "'in compliance with the Principles of Catholic social teaching.'" *Ibid*. The Bureau's executive director, who need not be a Catholic priest, supervises the operations of each subentity. *Id*., at 16, 3 N. W. 3d, at 673; see also 2023 WI App 12, ¶11, 406 Wis. 2d 586, 596, 987 N. W. 2d 778, 783.

Employees of the Bureau and its subentities are not re-quired to ascribe to any particular religious faith, and the same is true for the recipients of their charitable services. 411 Wis. 2d, at 16, 3 N. W. 3d, at 673; see also App. to Pet. for Cert. 383a. Participants in petitioners' charitable pro-grams do not receive religious training or orientation, and neither the Bureau nor its subentities "tr[ies] to 'inculcate'" participants with the Catholic faith. 411 Wis. 2d, at 16, 3 N. W. 3d, at 673. That rule, petitioners explain, reflects re-ligious doctrine prohibiting Catholic bodies from "'misus[ing] works of charity for purposes of proselytism.'" Brief for Petitioners 10 (quoting Directory for the Pastoral Ministry of Bishops "Apostolorum Successores" ¶196 (2004)). According to petitioners, Catholic teachings distin-guish between "evangelization," which involves "sharing one's faith," and "proselytization," which seeks to "influ-ence" or "coerc[e]" others into accepting one's religious views. Tr. of Oral Arg. 22–23. The former is permitted, and the latter is not, petitioners say. *Id*., at 22; see Brief for Petitioners 10.

C

In 2016, petitioners sought from the Wisconsin Depart-ment of Workforce Development a determination that they qualified for the religious-employer exemption set forth in Wis. Stat. §108.02(15)(h)(2). The department denied their request. See App. to Pet. for Cert. 351a. It acknowledged that petitioners are "supervised and controlled by the Ro-

man Catholic Church," thereby satisfying one of the two criteria for the exemption. *Id.*, at 352a, 356a, 360a, 364a, 368a. The department determined, however, that petitioners are not "operated primarily for religious purposes" within the meaning of the statute. *Ibid.* Petitioners appealed, and an Administrative Law Judge (ALJ) reversed the department's ruling. *Id.*, at 291a–350a.

In the years that followed, petitioners received a series of alternating wins and losses as the parties appealed up through the state administrative and judicial systems. The Wisconsin Labor and Industry Review Commission reversed the ALJ's decision and reinstated the department's denials of petitioners' exemption requests. See App. to Pet. for Cert. 212a–290a. After petitioners sought judicial review in state court, the state trial court overrode the commission, holding that petitioners are entitled to the exemption. See *id.*, at 190a. The State Court of Appeals, however, subsequently reversed. 406 Wis. 2d 586, 987 N. W. 2d 778. It reasoned that petitioners are not "operated primarily for religious purposes" because petitioners' "provision of charitable social services . . . are neither inherently or primarily religious activities." *Id.*, at 627, 629, 987 N. W. 2d, at 798, 799.

The Wisconsin Supreme Court affirmed. The court began by recognizing, as the lower courts had, that petitioners are "without question 'operated, supervised, controlled, or principally supported' by the Diocese of Superior." 411 Wis. 2d, at 22, 3 N. W. 3d, at 676 (quoting §108.02(15)(h)(2)). The dispositive question, then, was whether petitioners are "operated primarily for religious purposes." *Id.*, at 22, 3 N. W. 3d, at 676. The court interpreted that statutory phrase to require judicial inquiry into not only an organization's "motivations" but also its "activities." *Id.*, at 33, 3 N. W. 3d, at 682. To determine whether an organization's activities are "'primarily' religious in nature," the court held, courts should "focu[s] on whether an organization participated in

worship services, religious outreach, ceremony, or religious education." *Id.*, at 34–35, 3 N. W. 3d, at 682 (citing *United States* v. *Dykema*, 666 F. 2d 1096, 1100 (CA7 1981)). According to the court, that analysis would identify "'[t]ypical activities of an organization operated for religious purposes,'" while avoiding "'any subjective inquiry with respect to religious truth.'" 411 Wis. 2d, at 32, 3 N. W. 3d, at 681 (quoting *Dykema*, 666 F. 2d, at 1100; alteration in original).

Applying that standard, the court held that petitioners' activities are "secular in nature," not religious. 411 Wis. 2d, at 38, 3 N. W. 3d, at 684. Petitioners "neither attempt to imbue program participants with the Catholic faith nor supply any religious materials to program participants or employees," the court observed. *Id.*, at 35, 3 N. W. 3d, at 682. "Both employment with the organizations and services offered by the organizations are open to all participants regardless of religion," and the charitable services offered by the subentities could "be provided by organizations of either religious or secular motivations." *Id.*, at 35–36, 3 N. W. 3d, at 683. Based on that record, the court held that petitioners "are not operated primarily for religious purposes within the meaning of Wis. Stat. §108.02(15)(h)(2)." *Id.*, at 38, 3 N. W. 3d, at 684.

The court then addressed petitioners' argument that its interpretation of §108.02(15)(h)(2) violated the First Amendment's Religion Clauses. The court first held that its interpretation did not transgress church autonomy principles because the exemption "neither regulates internal church governance nor mandates any activity." *Id.*, at 50, 3 N. W. 3d, at 690. The court also determined that there was no risk of excessive government entanglement with religion because Wisconsin's exemption does not ask whether petitioners' "activities are consistent or inconsistent with Catholic doctrine." *Id.*, at 45, 3 N. W. 3d, at 687. Finally,

the court rejected petitioners' argument that its interpretation contravened First Amendment principles of "'neutrality among religions'" by "'favor[ing] religious groups that require those they serve to adhere to the faith of that group or be subject to proselytization.'" *Id.*, at 52–53, 3 N. W. 3d, at 691. This argument failed, the court said, because petitioners had not "demonstrate[d] that the statute imposes a constitutionally significant burden on their religious practice" in the first place. *Id.*, at 55, 3 N. W. 3d, at 692.[2]

Justice Rebecca Grassl Bradley authored a dissent, which Chief Justice Ziegler joined and Justice Hagedorn joined in part. Justice Bradley would have held that a nonprofit is "operated primarily for religious purposes," §108.02(15)(h)(2), when its motivations are religious, irrespective of the nature of its activities. The majority's contrary approach, the dissent warned, "engages in religious discrimination and entangles the state with religion in violation of the First Amendment." *Id.*, at 92–93, 3 N. W. 3d, at 710–711. While Justice Bradley recognized that "the application of secular criteria that leads to disparate treatment of religions is not religious discrimination," she reasoned that the majority's approach "necessarily and explicitly discriminates among certain religious faiths and religious practices." *Id.*, at 105, 3 N. W. 3d, at 717. It did so as applied to petitioners, Justice Bradley explained, by declaring them ineligible for the exemption based on explicitly religious criteria, including their adherence to Catholic teachings forbidding "proselytiz[ation] when conducting charitable acts." *Id.*, at 106, 3 N. W. 3d, at 717. That denominational discrimination, according to Justice Bradley, triggered strict scrutiny, which the State could not satisfy.

———————

[2] The Court today addresses only the denominational neutrality challenge raised by petitioners and does not reach the further two constitutional arguments considered by the Wisconsin Supreme Court.

See *id.*, at 108–110, 3 N. W. 3d, at 718–719.  Justice Hagedorn dissented separately, noting his agreement with Justice Bradley's construction of the statute.  *Id.*, at 122, 3 N. W. 3d, at 725.

We granted certiorari to decide whether the Wisconsin Supreme Court's interpretation of §108.02(15)(h)(2), as applied to petitioners, violates the First Amendment.  604 U. S. ___ (2024).

## II

### A

"The clearest command of the Establishment Clause" is that the government may not "officially prefe[r]" one religious denomination over another.  *Larson* v. *Valente*, 456 U. S. 228, 244 (1982).  This principle of denominational neutrality bars States from passing laws that "'aid or oppose'" particular religions, *Epperson* v. *Arkansas*, 393 U. S. 97, 106 (1968), or interfere in the "competition between sects," *Zorach* v. *Clauson*, 343 U. S. 306, 314 (1952).  The Establishment Clause's "prohibition of denominational preferences is inextricably connected with the continuing vitality of the Free Exercise Clause," too.  *Larson*, 456 U. S., at 245.  That is because the "'fullest realization of true religious liberty requires that government'" refrain from "'favoritism among sects.'"  *Id.*, at 246 (quoting *School Dist. of Abington Township* v. *Schempp*, 374 U. S. 203, 305 (1963) (Goldberg, J., concurring)).  Government actions that favor certain religions, the Court has warned, convey to members of other faiths that "'they are outsiders, not full members of the political community.'"  *Santa Fe Independent School Dist.* v. *Doe*, 530 U. S. 290, 309 (2000).

To guard against that serious harm, this Court in *Larson* v. *Valente*, 456 U. S. 228, set a demanding standard for the government to justify differential treatment across religions on denominational lines.  See *id.*, at 244–246.  When a state law establishes a denominational preference, courts

must "treat the law as suspect" and apply "strict scrutiny in adjudging its constitutionality." *Id.*, at 246. The government bears the burden to show that the relevant law, or application thereof, is "closely fitted to further a compelling governmental interest." *Id.*, at 251 (internal quotation marks omitted).

A law that differentiates between religions along theological lines is textbook denominational discrimination. Take, for instance, a law that treats "a religious service of Jehovah's Witnesses . . . differently than a religious service of other sects" because the former is "less ritualistic, more unorthodox, [and] less formal." *Fowler* v. *Rhode Island*, 345 U. S. 67, 69 (1953). Or consider an exemption that applies only to religious organizations that perform baptisms, engage in monotheistic worship, or hold services on Sunday. Such laws establish a preference for certain religions based on the content of their religious doctrine, namely, how they worship, hold services, or initiate members and whether they engage in those practices at all. Such official differentiation on theological lines is fundamentally foreign to our constitutional order, for "[t]he law knows no heresy, and is committed to the support of no dogma." *Watson* v. *Jones*, 13 Wall. 679, 728 (1872).

This case involves that paradigmatic form of denominational discrimination. In determining whether petitioners qualified for the tax exemption under §108.02(15)(h)(2), the Wisconsin Supreme Court acknowledged that petitioners are controlled by a church, the Roman Catholic Diocese of Superior, thereby satisfying one of the exemption's two criteria. 411 Wis. 2d, at 22, 3 N. W. 3d, at 676. The court's inquiry instead turned on whether petitioners are "operated primarily for religious purposes." Wis. Stat. §108.02(15)(h)(2); see 411 Wis. 2d, at 22, 3 N. W. 3d, at 676. On that criterion, the court recognized that petitioners' charitable works are religiously motivated. *Id.*, at 34, 3

N. W. 3d, at 682.  The court nevertheless deemed petitioners ineligible for the exemption under §108.02(15)(h)(2) because they do not "attempt to imbue program participants with the Catholic faith," "supply any religious materials to program participants or employees," or limit their charitable services to members of the Catholic Church.  *Id.*, at 35, 3 N. W. 3d, at 682–683.  Put simply, petitioners could qualify for the exemption while providing their current charitable services if they engaged in proselytization or limited their services to fellow Catholics.

Petitioners' Catholic faith, however, bars them from satisfying those criteria.  Catholic teaching, petitioners say, forbids "'misus[ing] works of charity for purposes of proselytism.'"  Brief for Petitioners 10 (quoting Directory for the Pastoral Ministry of Bishops "Apostolorum Successores" ¶196).  It also requires provision of charitable services "without making distinctions 'by race, sex, or religion.'"  Brief for Petitioners 7 (quoting App. to Pet. for Cert. 431a).  Many religions apparently impose similar rules prohibiting proselytization or religious differentiation in the provision of charitable services.  See Brief for Religious Liberty Scholars as *Amici Curiae* 12–13 (discussing beliefs in Judaism, Islam, Sikhism, and Hinduism).  Others seemingly have adopted a contrary approach.  See *id.*, at 12 (discussing practices of some Protestant denominations).

Wisconsin's exemption, as interpreted by its Supreme Court, thus grants a denominational preference by explicitly differentiating between religions based on theological practices.  Indeed, petitioners' eligibility for the exemption ultimately turns on inherently religious choices (namely, whether to proselytize or serve only co-religionists), not "'secular criteria'" that "happen to have a 'disparate impact' upon different religious organizations."  *Larson*, 456 U. S., at 247, n. 23.  Much like a law exempting only those religious organizations that perform baptisms or worship on

Sundays, an exemption that requires proselytization or exclusive service of co-religionists establishes a preference for certain religions based on the commands of their religious doctrine.

In short, as applied to petitioners by the Wisconsin Supreme Court, Wis. Stat. §108.02(15)(h)(2) imposes a denominational preference by differentiating between religions based on theological choices.

B

The State does not dispute that the government may not prefer one religion over another. See Brief for Respondents 35. Instead, the State argues that, when it comes to "[r]eligious accommodations" afforded by the government, courts should ask whether the accommodation's eligibility criteria are the product of "invidious discrimination" to determine if strict scrutiny applies. *Id.*, at 35, 37; see *id.*, at 42–43. This Court's decision in *Gillette* v. *United States*, 401 U. S. 437 (1971), the State contends, lends support to this rule. See Brief for Respondents 36. As the State would have it, *Gillette* stands for the premise that whenever a religious "accommodation's line serves 'considerations of a pragmatic nature' having 'nothing to do with a design to foster or favor any sect, religion, or cluster of religions,' the Establishment Clause is not offended." Brief for Respondents 36 (quoting *Gillette*, 401 U. S., at 452–453).

The inquiry set forth in *Gillette*, however, is inapposite. There, this Court rejected an Establishment Clause challenge to a provision of the Military Selective Service Act of 1967, which afforded a "conscientious objector" status to any person who, "'by reason of religious training and belief,'" was "'conscientiously opposed to participation in war in any form.'" *Gillette*, 401 U. S., at 441. Importantly, that exemption "focused on individual conscientious belief, not on sectarian affiliation." *Id.*, at 454. Conscientious objector status was thus "available on an equal basis" to members

of all religions under the Military Selective Service Act, as
this Court later explained in *Larson*. 456 U. S., at 247, n.
23 (discussing *Gillette*). "[O]n its face," the statute "simply
d[id] not discriminate on the basis of religious affiliation."
*Gillette*, 401 U. S., at 450.

The same is not true here. The Wisconsin Supreme
Court's interpretation of §108.02(h)(15)(2) facially differen-
tiates among religions based on theological choices. After
all, an exemption provided only to organizations that en-
gage in proselytization or serve only co-religionists is not,
on its face, "available on an equal basis" to all denomina-
tions. *Larson*, 456 U. S., at 247, n. 23. That type of "ex-
plicit" distinction between religious practices is what this
Court has deemed subject to strict scrutiny, including in the
context of religious exemptions. *Ibid.*; see *id.*, at 246–251.

Next, the State disputes the premise that petitioners
were denied coverage "because they do not proselytize or
serve only Catholics" in the course of performing charitable
work. Brief for Respondents 37. The State insists that, in-
stead, the Wisconsin Supreme Court excluded petitioners
because they had "identified no distinctively religious activi-
ty that would create difficulty in resolving unemployment
disputes." *Ibid.* When pressed at argument as to what
would qualify as such "distinctively religious activity" in the
context of providing charitable services, however, the State
clarified that it meant "activities that express and inculcate
religious doctrine: worship, proselytization, religious edu-
cation." Tr. of Oral Arg. 81; see also *id.*, at 84 ("What it
comes down to is whether the employees of the organization
are expressing and inculcating religious doctrine").

That understanding of the Wisconsin Supreme Court's
ruling, even if assumed correct, cannot save the statute
from strict scrutiny. Decisions about whether to "express
and inculcate religious doctrine" through worship, proselyt-
ization, or religious education when performing charitable
work are, again, fundamentally theological choices driven

by the content of different religious doctrines. *Id.*, at 81. A statute that excludes religious organizations from an accommodation on such grounds facially favors some denominations over others.

## III

Because §108.02(15)(h)(2) "grants denominational preferences of the sort consistently and firmly deprecated in our precedents," it "must be invalidated unless it is justified by a compelling governmental interest" and is "closely fitted to further that interest." *Larson*, 456 U. S., at 246–247. The State bears the burden of clearing that high bar, and it has failed to do so here.

Wisconsin justifies its law by reference to two principal interests. First, it argues that the law serves a compelling state interest in "ensuring unemployment coverage for its citizens." Brief for Respondents 44. Yet the State fails to explain how the theological lines drawn by §108.02(15)(h)(2) are narrowly tailored to advance that asserted interest, particularly as applied to petitioners. Indeed, petitioners operate their own unemployment compensation system for employees, which provides benefits largely "'equivalent'" to the state system. 406 Wis. 2d, at 614, 987 N. W. 2d, at 792. Furthermore, Wisconsin does not suggest that organizations like Catholic Charities, which decline to proselytize and choose to serve all-comers, are more likely to leave their employees without unemployment benefits. Nor could it: The record is devoid of such evidence.

The distinctions drawn by Wisconsin's regime, moreover, are vastly underinclusive when it comes to ensuring unemployment coverage for its citizens. Wisconsin exempts over 40 forms of "employment" from its unemployment compensation program. See §§108.02(15)(f)–(kt). Notably, those exemptions cover religious entities that provide charitable services in a similar manner to petitioners (that is, without

proselytizing or denominational differentiation), but are exempt because the work is done directly by the church itself or its ministers, rather than by a separate nonprofit organization controlled by the church. See §§108.02(15)(h)(1), (3). That underinclusiveness leaves "'appreciable damage to [the State's] supposedly vital interest unprohibited'" and therefore belies the State's claim of narrow tailoring. *Reed* v. *Town of Gilbert*, 576 U. S. 155, 172 (2015).

Second, the State argues that the Wisconsin Supreme Court's interpretation of §108.02(15)(h)(2) is "narrowly tailored to avoid entangling the state with employment decisions touching on religious faith and doctrine." Brief for Respondents 44. When an organization's employees "express an[d] inculcate religious doctrine through worship, proselytization, and religious education," the State explains, "misconduct disputes could often force the state to decide whether employees complied with religious doctrine." Tr. of Oral Arg. 72. Yet the State again fails to demonstrate that §108.02(15)(h)(2) is "closely fitted to further" that anti-entanglement interest. *Larson*, 456 U. S., at 247. To the extent the State seeks to avoid opining on employee compliance with religious teachings, it does not explain why it declined to craft an exemption limited to employees who are in fact tasked with inculcating religious doctrine. Instead, the exemption here functions at an organizational level, covering both the janitor and the priest in equal measure. See §108.02(15)(h)(2).

That overinclusiveness pervades Wisconsin's exemption regime more broadly, too. Recall that Wisconsin exempts from its unemployment compensation system all "church[es] or convention[s] or association[s] of churches" without differentiating between employees actually involved in religious works, for whom the anti-entanglement concern is relevant, and other staff. §108.02(15)(h)(1). The State itself concedes, as it must, that this regime contains "an element of over-inclusivity." Tr. of Oral Arg. 87. At

bottom, then, the poor fit between the State's asserted anti-entanglement concern and the line it has drawn among religious organizations cannot be described as narrow tailoring. The State has thus failed to carry its burden under strict scrutiny.

\*     \*     \*

It is fundamental to our constitutional order that the government maintain "neutrality between religion and religion." *Epperson*, 393 U. S., at 104. There may be hard calls to make in policing that rule, but this is not one. When the government distinguishes among religions based on theological differences in their provision of services, it imposes a denominational preference that must satisfy the highest level of judicial scrutiny. Because Wisconsin has transgressed that principle without the tailoring necessary to survive such scrutiny, the judgment of the Wisconsin Supreme Court is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

---

No. 24–154

---

CATHOLIC CHARITIES BUREAU, INC., ET AL.,
PETITIONERS *v*. WISCONSIN LABOR &
INDUSTRY REVIEW COMMISSION,
ET AL.

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
WISCONSIN

[June 5, 2025]

JUSTICE THOMAS, concurring.

A nonprofit organization is entitled to an exemption from Wisconsin's unemployment-insurance tax on employers if it is controlled by a church and "operated primarily for religious purposes." Wis. Stat. §108.02(15)(h)2 (2021–2022). The Wisconsin Supreme Court concluded that Catholic Charities Bureau (Catholic Charities) and its subentities are not such organizations, reasoning in two steps. First, the court held that the relevant "organization" is Catholic Charities and each of its subentities, not the broader Catholic Diocese of Superior of which it is a part. Second, it held that the purposes of Catholic Charities and its subentities are primarily secular, not religious. The Court concludes that the latter holding of the Wisconsin Supreme Court unconstitutionally discriminates against Catholic Charities and its subentities. I agree and join the Court's opinion in full. I write separately because, in my view, the Wisconsin Supreme Court's first holding was also wrong.

The First Amendment's guarantee of church autonomy gives religious institutions the right to define their internal governance structures without state interference. Religious institutions may create different corporate entities to help manage their temporal affairs, but those entities do

not define the broader religious institution's internal struc-
ture.  Here, although Catholic Charities and its subentities
are separately incorporated from the Diocese of Superior,
they are, as a matter of church law, simply an arm of the
Diocese.

I

The First Amendment guarantees to religious institu-
tions broad autonomy to conduct their internal affairs and
govern themselves.  This guarantee, which we have called
the "church autonomy doctrine," provides that a religious
institution is not defined by the corporate entities it chooses
to form.

A

The Religion Clauses of the First Amendment proscribe
laws "respecting an establishment of religion, or prohibiting
the free exercise thereof."  Among other protections, these
Clauses guarantee the "right to organize voluntary reli-
gious associations," *Watson* v. *Jones*, 13 Wall. 679, 728
(1872), and to allow these associations to "decide for them-
selves, free from state interference, matters of church gov-
ernment as well as those of faith and doctrine," *Kedroff* v.
*Saint Nicholas Cathedral of Russian Orthodox Church in
North America*, 344 U. S. 94, 116 (1952).[1]  For instance,

_____

[1] I have long questioned whether the Establishment Clause, as "a fed-
eralism provision intended to prevent Congress from interfering with
state establishments," applies to the States. *Elk Grove Unified School
Dist.* v. *Newdow*, 542 U. S. 1, 49 (2004) (opinion concurring in judgment).
Although our decisions have grounded the church autonomy doctrine in
both Religion Clauses, they have also made clear that the Free Exercise
Clause is an independently sufficient basis for the doctrine.  See, *e.g.*,
*Our Lady of Guadalupe School* v. *Morrissey-Berru*, 591 U. S. 732, 746
(2020) (framing interference with church autonomy as independent vio-
lations of the Establishment and Free Exercise Clauses); *Kedroff*, 344
U. S., at 107–108, 115–116, 120–121 (basing the doctrine on the Free Ex-
ercise Clause alone).  My skepticism toward the incorporation of the Es-
tablishment Clause therefore does not lead me to doubt the correctness

"courts are bound to stay out of employment disputes involving those holding certain important positions with churches and other religious institutions." *Our Lady of Guadalupe School* v. *Morrissey-Berru*, 591 U. S. 732, 746 (2020). And, where resolution of a property dispute turns on the internal law of a hierarchically structured church, such as who is the properly appointed pastor of a congregation, courts must defer to "the decisions of the highest ecclesiastical tribunal within [the] church." *Serbian Eastern Orthodox Diocese for United States and Canada* v. *Milivojevich*, 426 U. S. 696, 709 (1976).

The Religion Clauses' special protection for the autonomy of religious institutions derives from at least three sources.

*First* is the right of association. This Court has "long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others." *Roberts* v. *United States Jaycees*, 468 U. S. 609, 622 (1984). As with other voluntary associations, those "who unite themselves to [a religious] body do so with an implied consent to" its internal system of "government, and are bound to submit to it." *Watson*, 13 Wall., at 729. And, since "the text of the First Amendment . . . gives special solicitude to the rights of religious organizations," they must enjoy a greater right to control their own affairs than that enjoyed by other groups. *Hosanna-Tabor Evangelical Lutheran Church and School* v. *EEOC*, 565 U. S. 171, 189 (2012).

*Second* is the reality that matters of religious "faith and doctrine" are "closely linked to . . . matters of church government." *Our Lady*, 591 U. S., at 746 (internal quotation marks omitted). Who serves as a church's minister, for instance, determines whether the "preaching, teaching, and counseling" a congregation receives conforms to the faith that it professes. *Id.*, at 747. And, the polity of a religious

_____

of our precedents in this area.

institution is often itself a matter of faith. In the Catholic Church, for instance, the leadership of the Pope over the Church is essential, because it is an article of faith that Jesus Christ personally established the office of Pope. See First Vatican Council, Pastor Aeternus, chs. 1–2 (1870) (citing Matthew 16:16–19), in 2 Decrees of the Ecumenical Councils 811, 812–813 (N. Tanner ed. 1990) (Tanner). The free exercise rights of individuals thus cannot be adequately protected unless the autonomy of religious institutions is also protected.

*Third* is the understanding that church and state are "two rightful authorities," each supreme in its own sphere. M. McConnell, The Origins and Historical Understanding of Free Exercise of Religion, 103 Harv. L. Rev. 1409, 1496–1497 (1990) (McConnell). This concept has deep roots in the history of Western civilization. Jesus famously said to render "unto Caesar the things which are Caesar's; and unto God the things that are God's." Matthew 22:21. From antiquity onward, many Christians have interpreted this statement to mean that church and state are distinct, and that each has a legitimate claim to authority within its sphere. See *Huntsman* v. *Corporation of President of Church of Jesus Christ of Latter-day Saints*, 127 F. 4th 784, 803–804 (CA9 2025) (en banc) (Bumatay, J., concurring); R. Renaud & L. Weinberger, Spheres of Sovereignty: Church Autonomy Doctrine and the Theological Heritage of the Separation of Church and State, 35 N. Ky. L. Rev. 67, 68–84 (2008) (tracing the historical development of "[t]he doctrine of separate spheres of authority for church and state"). Pre-founding English law accordingly distinguished between temporal matters subject to civil courts' jurisdiction and spiritual matters subject to ecclesiastical jurisdiction. See *McRaney* v. *North Am. Mission Bd. of Southern Baptist Convention, Inc.*, 980 F. 3d 1066, 1076–1078 (CA5 2020) (Oldham, J., dissenting from denial of rehearing en banc).

The First Amendment was adopted "against this background" of distinct spheres for secular and religious authorities. *Hosanna-Tabor*, 565 U. S., at 183. In arguing for religious freedom for Baptists, for example, James Madison appealed to the notion of "independent" "spiritual and earthly authorities." McConnell 1497. According to Madison, man's "duty towards the Creator . . . is precedent, both in order of time and in degree of obligation, to the claims of Civil Society." Memorial and Remonstrance Against Religious Assessments (1785), in 8 Papers of James Madison 295, 299 (R. Rutland, W. Rachal, B. Ripel, & F. Teute eds. 1973). Thus, "Religion is wholly exempt from [Civil Society's] cognizance." *Ibid.* In a similar vein, early American decisions justified protections for church autonomy in part based on the need to respect religious institutions' legitimate and distinct sphere of authority. See, *e.g.*, *Watson*, 13 Wall., at 733 (holding that "the civil courts exercise no jurisdiction" over matters of "ecclesiastical government" because doing so "would deprive [religious] bodies of the right of construing their own church laws"); *Chase* v. *Cheney*, 58 Ill. 509, 538 (1871) ("'Causes spiritual must be judged by judges of the spirituality, and causes temporal by temporal judges'"); *Harmon* v. *Dreher*, 17 S. C. Eq. 87, 120 (1843) ("It belongs not to the civil power to enter into or review the proceedings of a Spiritual Court"); see also K. Funk, Church Corporations and the Conflict of Laws in Antebellum America, 32 J. Law & Religion 263, 281 (2017) (Funk) (observing that 19th century decisions developing the church autonomy doctrine "essentially treated these church tribunals as competent foreign courts").

## B

The church autonomy doctrine has important ramifications for the incorporation of religious institutions. Establishing corporate entities is essential for religious institutions to manage their temporal affairs. But, the doctrine

forbids treating religious institutions as nothing more than the corporate entities that they form.

1

Religious institutions do not exist apart from the secular world.  They need to buy and sell property.  They need to hire and pay staff.  They need to form contracts and file lawsuits.  They need their property arrangements to persist when personnel changes, and they need their property to remain secure when individual members of the institution become insolvent.  These and other considerations make the formation of corporate entities essential for many religious institutions.

At the same time, the church autonomy doctrine forbids treating religious institutions as nothing more than the corporate entities they have formed.  A corporation is a "mere creature of law" that generally "possesses only those properties which the charter of its creation confers upon it." *Trustees of Dartmouth College* v. *Woodward*, 4 Wheat. 518, 636 (1819); see also *Kamen* v. *Kemper Financial Services, Inc.*, 500 U. S. 90, 98–99 (1991) ("Corporations . . . are creatures of state law, and it is state law which is the font of corporate directors' powers" (internal quotation marks and alteration omitted)).  And, state law has a great deal to say about how a corporation must be structured.  See, *e.g.*, Del. Code Ann., Tit. 8, §141 (2019) (generally requiring Delaware corporations to be overseen by a board of directors).  But, under the church autonomy doctrine, religious institutions are a parallel authority to the State, not a creature of state law.  *Supra*, at 4–5.  And, the State has no legitimate role in defining the structure of its polity.  To conclude that a religious institution has no existence outside its corporate form "would be in effect to decide that our religious liberties [are] dependent on the will of the legislature, and not guaranteed by the constitution." *Burr's Ex'rs* v. *Smith*, 7 Vt. 241, 282 (1835).

Instead, courts and commentators have long recognized that "while a legal entity may represent the church or other body of believers, the entity alone is not the church; it is only a part of the entire religious organization." 1 W. Bassett, W. Durham, R. Smith, & M. Goldfeder, Religious Organizations and the Law §8:2, p. 8–7 (2022). "The entity is merely used by the organization rather than being identical to the organization itself." *Ibid.* A religious corporation thus possesses a "dual personality": It is at once a corporation defined by state law and a part of a broader, "unincorporated" religious institution. *Id.*, at 8–6 to 8–7; accord, *Classis of Central Cal.* v. *Miraloma Community Church*, 177 Cal. App. 4th 750, 763, 99 Cal. Rptr. 3d 449, 459 (2009); *Crissman* v. *Board of Trustees of Cathedral of Tomorrow of Akron, Inc.*, 1990 WL 31796, \*2 (Ohio Ct. App., Mar. 21, 1990); *Folwell* v. *Bernard*, 477 So. 2d 1060, 1063 (Fla. Dist. Ct. App. 1985); *Trinity Presbyterian Church of Montgomery* v. *Tankersley*, 374 So. 2d 861, 866 (Ala. 1979); *Willis* v. *Davis*, 323 S. W. 2d 847, 848 (Ky. 1959); *Wheelock* v. *First Presbyterian Church*, 119 Cal. 477, 483, 51 P. 841, 843–844 (1897).

For instance, in *Watson*, the "nominal title-holders and custodians of the church property" at issue were "a body corporate" created by an "act of the Kentucky legislature." 13 Wall., at 720. That corporation, this Court recognized, was not itself the church, but merely an entity "under the control of the church session," an ecclesiastical "governing body . . . composed of the ruling elders and pastor." *Ibid.* Thus, "the constitution, usages, and laws of the Presbyterian [Church]," not Kentucky corporate law, controlled the outcome of the dispute. *Ibid.*

### 2

We have recognized that the original "understanding" of the Religion Clauses' protection of church autonomy is "reflected" in early postratification practice. *Hosanna-Tabor*,

565 U. S., at 184–185; see also *Marsh* v. *Chambers*, 463
U. S. 783, 787–790 (1983) (looking to early federal and state
practice to determine the scope of the Establishment
Clause).  Here, that history confirms that religious institu-
tions are more than the corporate entities that they form—
and that conflating the two undermines the First Amend-
ment rights of religious institutions.

Before Independence, corporate law provided the civil
government with a mechanism to interfere in ecclesiastical
affairs.  Religious institutions had a particularly acute need
to incorporate during that period, because "an unincorpo-
rated association could not hold property in its own right."
P. Kauper & S. Ellis, Religious Corporations and the Law,
71 Mich. L. Rev. 1499, 1505 (1973).  But, incorporating was
not easy.  In most Colonies, a religious group had to petition
the government for a special charter of incorporation.  *Id.*,
at 1507.  And, the government frequently denied the re-
quests of disfavored religious denominations.  *Ibid.*; see M.
McConnell, Establishment and Disestablishment at the
Founding, Part I: Establishment of Religion, 44 Wm. &
Mary L. Rev. 2105, 2134–2135 (2003).

Following the Revolution, New York took a different
path, enacting a statute to allow churches to incorporate
without a special charter.  1784 N. Y. Laws ch. 18, p. 613
(1784 Act).  The State grounded its new approach in respect
for church autonomy.  Invoking the free exercise clause of
the State's 1777 constitution, the preamble to the 1784 Act
condemned the legislature's former practice of providing for
"illiberal and partial distributions of charters of incorpora-
tion to religious societies."  *Ibid.*  The 1784 Act liberalized
the incorporation process "to enable every religious denom-
ination to provide for the decent and honorable support of
divine worship."  *Id.*, at 614.

The 1784 Act authorized members of a church to elect
trustees who, upon registering with a court, would become
a body corporate able to hold property, exist perpetually,

and sue in court. *Id*., at 614–615. But, although this body could be "intrusted with the management, care and disposition of the temporalities of [the] church," the Act made clear that the corporate body was not the church itself. *Id*., at 618. The Act did not purport to name the trustees the leaders of the church, but took for granted that each church would be headed by a "minister." *Id*., at 614. And, the Act specifically warranted that its provisions did not "in the least . . . alter or change the religious constitutions or governments" of any "churches." *Id*., at 618.

The 1784 Act soon became a model for the Nation at large. With a handful of exceptions, analogous statutes were "adopted in every American state during the antebellum era." Funk 268, and n. 20 (collecting statutes). This Court approved this trend, holding that it neither established religion nor restrained free exercise for a legislature to "enact laws more effectually to enable all sects to accomplish the great objects of religion by giving them corporate rights for the management of their property." *Terrett* v. *Taylor*, 9 Cranch 43, 48–49 (1815). Thus, like New York and the States following its approach, this Court too framed incorporation as a way to empower religious institutions, not to define them or alter their polity.

In contrast, when Congress in 1811 attempted to use the corporate form to define a church's internal form of government, President James Madison raised a decisive constitutional objection. "Congress had passed a bill incorporating the Protestant Episcopal Church in the town of Alexandria in what was then the District of Columbia." *Hosanna-Tabor*, 565 U. S., at 184. President Madison vetoed the bill, finding that it violated the First Amendment because it did not respect "the essential distinction between civil and religious functions." 22 Annals of Cong. 982–983 (1811). Madison further explained:

"The bill enacts into, and establishes by law, sundry

rules and proceedings relative purely to the organiza-
tion and polity of the church incorporated, and compre-
hending even the election and removal of the Minister
of the same; so that no change could be made therein
by the particular society, or by the general church of
which it is a member, and whose authority it recog-
nises." *Id.*, at 983.

See also *Hosanna-Tabor*, 565 U. S., at 184–185 (recounting
this episode and citing it as an early invocation of the
church autonomy doctrine).

In short, the corporation is made for the church, not the
church for the corporation. Both the basic principles of
church autonomy and the history of religious corporations
establish that religious institutions are more than the cor-
porate entities that they form. It follows that the govern-
ment may not use such entities as a means of regulating the
internal governance of religious institutions.

## II

As a matter of church law, Catholic Charities and its sub-
entities are an arm of the Diocese of Superior, and thus, for
religious purposes, are not distinct organizations. But,
when determining whether Catholic Charities was a reli-
gious organization entitled to a tax exemption, the Wiscon-
sin Supreme Court nevertheless relied on Catholic Chari-
ties' separate corporate charter to treat it as an entity
entirely distinct and separate from the Diocese. That hold-
ing contravened the church autonomy doctrine.

## A

The Catholic Church is a single worldwide religious insti-
tution. The Church is headed by the Pope. Code of Canon
Law, Canon 331 (Latin-English ed. 1998). Catholics believe
that the Pope is the successor of St. Peter, the Apostle cho-
sen by Jesus to lead the Church. *Ibid.*; *supra*, at 4. The

Church is divided into dioceses. A diocese generally consists of "all the faithful living" within "a definite territory," who together constitute "a particular church" within the universal church. Code of Canon Law, Canons 369, 372, §1. Each diocese is "entrusted to a bishop for him to shepherd." Canon 369. The bishop exercises "legislative, executive, and judicial power" over his diocese. Canon 391, §1.

This structure of the Church is a matter of faith, not mere administrative convenience. Catholics believe that in naming the Apostles, Jesus personally established the office of bishop and willed that "the bishops . . . should be shepherds in his church right to the end of the world." Second Vatican Council, Lumen Gentium §18 (1964) (citing John 20:21), in 2 Tanner 849, 863; see Code of Canon Law, Canon 375, §1 ("Bishops . . . by divine institution succeed to the place of the Apostles through the Holy Spirit who has been given to them").

The Church understands itself to have a "three-fold" religious mission: "proclaiming the word of God," "celebrating the sacraments," and "exercising the ministry of charity." Pope Benedict XVI, Deus Caritas Est ¶25(a) (2005). "These duties presuppose each other and are inseparable." *Ibid.* "The Church" therefore "cannot neglect the service of charity"—that is, care "for widows and orphans, prisoners, and the sick and needy of every kind"—"any more than she can neglect the Sacraments and the Word." *Id.*, ¶22.

In keeping with the Church's hierarchical structure, "the Bishops" have "primary responsibility for carrying out . . . the service of charity" at the local level. Pope Benedict XVI, On the Service of Charity, Introduction (2012) (internal quotation marks omitted). In particular, bishops are bound under canon law to establish within their territories organizations to carry out charitable works in the name of the Church subject to their supervision and control. Brief for Catholic Charities USA as *Amicus Curiae* 18; see generally

On the Service of Charity. "In the United States, these organizations are known as Catholic Charities." Brief for Catholic Charities USA as *Amicus Curiae* 15. The works of these organizations are considered acts of the Church itself. Deus Caritas Est ¶29.

The Diocese of Superior covers the northwest corner of Wisconsin. Catholic Charities is the "social ministry arm" of the Diocese. App. to Pet. for Cert. 371a.[2] In keeping with Catholic principles, the Bishop of Superior serves as the head of Catholic Charities and exercises plenary authority over it.

Catholic Charities is organized under state law as a nonprofit corporation governed by three members. The first member is the Bishop, who serves as the organization's president. The second member is the Diocese's vicar general, who is the vice president. Under canon law, the vicar general is a priest chosen by the bishop to "assist him in the governance of the whole diocese." Code of Canon Law, Canons 475, §1, 478, §1. The third member is the organization's executive director, who need not be a priest. The bishop appoints both the vicar general and the executive director, who serve at his pleasure. This structure gives the Bishop control over both Catholic Charities and its separately incorporated subentities, up to and including the power to dissolve them at will. See App. 193.

B

The Wisconsin Supreme Court disregarded this structure of Catholic Charities and its subentities in adjudicating the case below. The court acknowledged Catholic Charities' status as an "arm" of the Diocese of Superior subject to the bishop's "control." 2024 WI 13, ¶¶7, 9, 411 Wis. 2d 1, 13–14, 3 N. W. 3d 666, 672. It nonetheless viewed Catholic

───────────
[2] Although there are other organizations called Catholic Charities affiliated with other dioceses, the Catholic Charities involved in this suit is limited to the Diocese of Superior.

Charities and its subentities as distinct, nonreligious organizations merely because they are separately incorporated.

Wisconsin imposes a tax on employers to cover the cost of state-provided unemployment benefits. Wis. Stat. §§108.17–108.18. The tax covers most employers in the State, but an exception applies if the employer is "a church" or "an organization" controlled by a church that is "operated primarily for religious purposes." §§108.02(15)(h)1–2; see *ante,* at 2. Catholic Charities and four of its subentities sought an exemption under the latter category. The Wisconsin Supreme Court held that the organizations were not operated for religious purposes, and thus that excluding Catholic Charities and its subentities from the exemption did not violate the Religion Clauses of the First Amendment. See *ante,* at 5–7.

In construing the scope of the exemption, the court began with "the threshold question of *whose* purposes we must examine in our analysis—those of the Diocese or those of [Catholic Charities] and its sub-entities." 411 Wis. 2d, at 23, 3 N. W. 3d, at 676. The court treated this question as one of ordinary statutory interpretation, determining that the "plain language" of the statute required looking to the individual corporate entity's purpose, not the purpose of the church that operates or controls it. *Ibid.,* 3 N. W. 3d, at 676–677.

Catholic Charities objected that examining "itself and its sub-entities as corporations separate from" the Diocese violates the First Amendment's guarantee of church autonomy by "'divid[ing] up religious bodies according to secular principles.'" *Id.,* at 49, 3 N. W. 3d, at 689 (alteration in original). The Wisconsin Supreme Court disagreed. It acknowledged that, under the First Amendment, matters of ecclesiastical governance "belong to the church alone." *Id.,* at 50, 3 N. W. 3d, at 690. But, it insisted that the exemption

simply "defines what employment is for purposes of unemployment insurance without reference to any religious principles or any attempt to control internal operations." *Ibid.*; see *ante,* at 6.

The Wisconsin Supreme Court's resolution of this threshold question was outcome determinative. The court recognized that the Diocese's "purpose is religious by nature." 411 Wis. 2d, at 24, 3 N. W. 3d, at 677. In contrast, the court found that Catholic Charities' and its subentities' purposes "are primarily charitable and secular." *Id.*, at 35, 3 N. W. 3d, at 683; see *ante,* at 6. As Wisconsin concedes, had the court resolved the threshold question of whose purpose controls the other way, it would have found that Catholic Charities and its subentities "would qualify for the church exemption." Tr. of Oral Arg. 73–74.

C

By failing to defer to the Bishop of Superior's religious view that Catholic Charities and its subentities are an arm of the Diocese, the Wisconsin Supreme Court violated the church autonomy doctrine.

Wisconsin's unemployment tax implicates the church autonomy doctrine. The statute on its face treats religious institutions differently from secular institutions: If an employer is "a church" or "an organization" controlled by a church that is "operated primarily for religious purposes," it is exempt from the tax; if not, the tax applies. Wis. Stat. §§108.02(15)(h)1–2. The statute makes this distinction precisely "to preserve the religious autonomy of [the exempted] organizations." Brief for Respondents 32; see *ante,* at 14. The statute thus does not simply impose neutral and generally applicable burdens that do not affect internal governance; it requires civil courts to classify employers as religious or not, and to treat them differently based on that classification.

But, the church autonomy doctrine leaves it to religious

institutions to define their internal structure for themselves. *Kedroff*, 344 U. S., at 116. When deciding whether an employer qualifies as a religious institution, a civil court must accept the employer's understanding of its internal structure, just as it must accept the employer's understanding of its religious beliefs generally. See *Milivojevich*, 426 U. S., at 709 ("To permit civil courts to probe deeply enough into the allocation of power within a hierarchical church so as to decide religious law governing church polity would violate the First Amendment in much the same manner as civil determination of religious doctrine" (internal quotation marks and alterations omitted)).

Here, there is no dispute that, as a matter of church governance, the Bishop of Superior—the head of both the Diocese of Superior and Catholic Charities—considers Catholic Charities and its subentities to be an "arm" of the Diocese rather than a distinct organization. *Supra*, at 12. In other words, Catholic Charities and its subentities are corporate entities that the Diocese has created to carry out its religious mission. It is therefore dispositive that, as the State concedes, the Diocese qualifies for the religious employer exemption. Tr. of Oral Arg. 73–74. As an arm of the Diocese from the Bishop's perspective, Catholic Charities and its subentities must qualify as well, regardless of whether their activities, considered in isolation, would qualify as religious.

In holding otherwise, the Wisconsin Supreme Court entirely disregarded the Bishop's religious judgment, relying instead on the fact that Catholic Charities and its subentities "are organized as separate corporations apart from the church itself." 411 Wis. 2d, at 35, 3 N. W. 3d, at 682. The court thus made the error of treating a religious institution as nothing more than its corporate entities.

Wisconsin defends its Supreme Court's judgment, arguing that the church autonomy doctrine is inapposite because the State has not compelled the Diocese to alter its

structure. In Wisconsin's view, the State has only imposed a minor tax to which the Diocese has no conscience objection. But, "the First Amendment protects against 'indirect coercion or penalties on the free exercise of religion, not just outright prohibitions.'" *Carson* v. *Makin*, 596 U. S. 767, 778 (2022). The exclusion of "religious observers from otherwise available public benefits" is a cognizable free exercise burden. *Ibid.* This principle applies with full force to the church autonomy doctrine. The doctrine rests on the premise that "civil courts" must "exercise no jurisdiction" over "*subject-matter[s]*" that are "ecclesiastical in its character." *Watson*, 13 Wall., at 733 (emphasis added). Regardless of whether the religious institution's injury is direct coercion or the withholding of a benefit, "essentially religious controversies" are an inappropriate subject matter for civil courts to decide. *Milivojevich*, 426 U. S., at 709.

*      *      *

The Court correctly holds that Catholic Charities and its subentities have suffered unconstitutional religious discrimination even on the assumption that those entities should be considered in isolation. See *ante,* at 9–11. I would reverse for an additional reason—that the Wisconsin Supreme Court violated the church autonomy doctrine. However incorporated, Catholic Charities and its subentities are, from a religious perspective, a mere arm of the Diocese of Superior. The Wisconsin Supreme Court should have deferred to that understanding, and its failure to do so amounted to an unlawful attempt by the State to redefine the Diocese's internal governance.

# SUPREME COURT OF THE UNITED STATES

---

No. 24–154

---

## CATHOLIC CHARITIES BUREAU, INC., ET AL., PETITIONERS *v.* WISCONSIN LABOR & INDUSTRY REVIEW COMMISSION, ET AL.

### ON WRIT OF CERTIORARI TO THE SUPREME COURT OF WISCONSIN

[June 5, 2025]

JUSTICE JACKSON, concurring.

The Federal Unemployment Tax Act (FUTA) allows a State to exempt from its unemployment-coverage mandate any "organization which is operated primarily for religious purposes and which is operated, supervised, controlled, or principally supported by a church or convention or association of churches." 26 U. S. C. §3309(b)(1)(B). Like many States, Wisconsin enacted a religious-purposes exemption that tracks §3309(b)(1)(B). As the Court explains, the Wisconsin Supreme Court's application of that exemption has created a constitutional problem: The State treats church-affiliated charities that proselytize and serve co-religionists exclusively differently from those that do not. *Ante*, at 2. Because I agree that this distinction violates the neutrality principle of the Constitution's Religion Clauses, I join the Court's opinion in full.

I write separately because, in my view, FUTA's religious-purposes exemption does not distinguish between charitable organizations based on their engagement in proselytization or their service to religious adherents. Nor does that exemption differentiate based on religious motivation, as the Government (as *amicus*) insists. Rather, both the text

and legislative history of FUTA's religious-purposes exemption confirm that Congress used the phrase "operated primarily for religious purposes" to refer to the organization's function, not its inspiration.  Put differently, §3309(b)(1)(B) turns on *what* an entity does, not *how* or *why* it does it.

I

America constructed its unemployment-insurance system during the Great Depression to mitigate the disruptive effects of sudden job loss on workers.  Wisconsin led the way in 1932, after identifying unemployment as "an urgent public problem."  Wis. Stat. §108.01(1).  Congress followed suit later that same decade by enacting FUTA, which "called for a cooperative federal-state program of benefits to unemployed workers." *St. Martin Evangelical Lutheran Church* v. *South Dakota*, 451 U. S. 772, 775 (1981).

FUTA operates by setting a federal minimum level of unemployment coverage that state programs must provide to remain eligible for certain grants and tax incentives. §§3302, 3304.  To obtain federal approval, States must mandate participation by at least those categories of employers that federal law requires to be covered.  §3304.  FUTA also allows—but does not compel—States to exempt specific categories of employers from mandatory participation.

Before 1970, FUTA allowed States to exempt nearly all nonprofit employers from unemployment coverage.  See §3306(c)(8) (1964 ed.).  But in 1970, Congress reversed course and required the opposite: that state unemployment-insurance programs cover most nonprofit workers.  See Employment Security Amendments of 1970, §104, 84 Stat. 697.  Addressing this raising of the unemployment-coverage floor, the House Ways and Means Committee found that, with respect to nonprofit organizations, "unemployment affects a substantial number of their employees, particularly people working in nonprofessional occupations."  H. R. Rep. No. 91–612, p. 11 (1969) (H. R. Rep.).  FUTA's inclusion of

nonprofits addressed Congress's concerns "about the need of their employees for protection against wage loss resulting from unemployment." *Ibid.*

The 1970 amendments further specified certain "new and narrower" categories of permissible nonprofit exemptions. *St. Martin,* 451 U. S., at 777; see also §3309(b). One was the religious-purposes provision at issue here. Per the statute's language (which Wisconsin subsequently adopted), a State can choose to exempt from its unemployment-insurance mandate "an organization which is operated primarily for religious purposes and which is operated, supervised, controlled, or principally supported by a church or convention or association of churches." §3309(b)(1)(B).[1]

## II

This case arises out of a dispute about the meaning of the phrase "operated primarily for religious purposes" in Wis. Stat. §108.02(15)(h)(2), which tracks §3309(b)(1)(B). When the Wisconsin Supreme Court affirmed the denial of petitioners' exemption request, it concluded that this clause requires judicial inquiry into "both the motivations and the activities of the organization." 411 Wis. 2d 1, 33 (2024). With respect to activities, the court examined *how* Catholic Charities and its subentities provided their charitable services, and in particular, whether they did so while "attempt[ing] to imbue program participants with the Catholic faith [o]r supply[ing] any religious materials to program participants or employees." *Id.,* at 35. (They did not.) It also observed that "[b]oth employment with the organizations and services offered by the organizations are open to all participants regardless of religion." *Ibid.* The court further suggested that a church-affiliated charity would likely

---

[1] Wisconsin extended its unemployment-insurance program to cover nonprofits, consistent with the 1970 FUTA amendments, in 1971. See 1971 Wis. Laws ch. 53. It also added a religious-purposes exemption that mirrors §3309(b)(1)(B). See Wis. Stat. §108.02(15)(h)(2).

obtain the exemption if it engaged in "'teaching, evangelism, and worship,'" but not otherwise. *Ibid.*

The Government urges us to hold that FUTA's use of the phrase "operated primarily for religious purposes" refers only to *why* the organization is engaging in the charitable work at issue—*i.e.*, "the motivations that drive the organization to conduct its activities." Brief for United States as *Amicus Curiae* 2. It argues that, in the context of an individual, the word "purposes" most naturally refers to "the mental state" accompanying their activities. *Id.*, at 22. So, the Government contends, a charity's eligibility for the exemption must turn on its underlying motives. *Ibid.*

In my view, however, neither Wisconsin's motivations-plus-activities reading (the *how*) nor the Government's motivations-only interpretation (the *why*) accurately captures what Congress intended when it devised §3309(b)(1)(B) to allow an exemption for church-affiliated entities that are "operated primarily for religious purposes." I think, instead, that §3309(b)(1)(B) relates solely to *what* the entity does. I reach that conclusion first by examining the text of the provision and then by consulting the statute's established enactment history. These sources clarify that the religious-purposes exemption is not applicable to general charitable organizations—*e.g.*, soup kitchens, hospitals, or orphanages. Rather, Congress designed the exemption to capture a much narrower category of employers: church-affiliated entities that exist to perform religious functions.

A

Start with the text. To fall within §3309(b)(1)(B)'s exemption, an employer must satisfy two requirements. First, it must be "operated primarily for religious purposes." §3309(b)(1)(B). Second, it must be "operated, supervised, controlled, or principally supported by a church or convention or association of churches." *Ibid.* Here, no one disputes that the Catholic Church operates, supervises, controls, or

principally supports the charities at issue. The fight is over whether church-affiliated charitable organizations—subentities that primarily provide job training, mental health, and other services to those with developmental disabilities, along with the entity that oversees these and other charities—satisfy the first requirement; that is, whether they "operat[e] primarily for religious purposes" within the meaning of this provision. *Ibid.*

Notably, the language of the provision only goes so far, because §3309(b)(1)(B) does not define the term "religious purposes." And "purposes" admits of several possible meanings. When used in certain contexts, such as "on purpose," the term can refer to one's "intent." Webster's Third New International Dictionary 1847 (1971). But it can also mean "an end or aim to be kept in view in any plan, measure, exertion, or operation." *Ibid.* Another way of conceptualizing this second definition is: "[T]he object which one has in view" or "[t]he object for which anything is done or made, or for which it exists." 12 Oxford English Dictionary 878 (2d ed. 1989). This accords with common usage of the term. If something is put "to no good purpose," then it is not performing any effective function.

The Government does not dispute that "purposes" can refer to ends. Brief for United States as *Amicus Curiae* 15. But it views "ends" as relating solely to "an organization's fundamental motivation for its affairs," not "the nature of [its] activities." *Id.*, at 15–16. The Government does not explain how it makes this logical leap—from the entity's end (*i.e.*, the object it exists to achieve) to the entity's motivation (*i.e.*, its inspiration for seeking that achievement). In my view, the only way to close the gap is to try to ascertain Congress's intent. That is, because "religious purposes" is susceptible to more than one reading in this context (it could mean either *what* an entity does or *why* it does it), an interpreter of this provision must ask: *Which* reading did

Congress intend when it inserted that phrase into this statute?

The text of §3309(b)(1)(B) itself provides a clue. If one reads "operated primarily for religious purposes" to track an organization's motivation, rather than its function, the provision becomes almost entirely superfluous.

Recall that, to be exempt under §3309(b)(1)(B), the organization must be "operated, supervised, controlled, or principally supported by a church or convention or association of churches." And, of course, *every* church has religious motives for its activities. Thus, prong two of §3309(b)(1)(B) *already* establishes religious motivation (the charitable entity is, after all, run by or otherwise closely affiliated with a church)—leaving prong one with no additional work to do if it, too, is interpreted as a religious-motive element. While not dispositive, this superfluidity problem weighs in favor of a construction of "operated primarily for religious purposes" that looks to what an entity does rather than its motives. See *TRW Inc.* v. *Andrews*, 534 U. S. 19, 31 (2001) ("'[A] statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant'" (quoting *Duncan* v. *Walker*, 533 U. S. 167, 174 (2001))).

The functional understanding of "operated primarily for religious purposes" also makes perfect sense. So interpreted, it addresses a different factor than prong two because it gets at what the church-run entity actually does. Workforce programs train workers. Hospitals care for the sick. Soup kitchens feed the hungry. Shelters house the homeless.

That said, I admit that §3309(b)(1)(B)'s text alone may not provide a dispositive answer, and thus requires further exploration. For that reason, I look to the provision's enactment history. See *American Broadcasting Cos.* v. *Aereo, Inc.*, 573 U. S. 431, 438–439 (2014) (turning to legislative

history when text is ambiguous); cf. *Delaware* v. *Pennsylvania*, 598 U. S. 115, 138–139 (2023) ("'[C]lear evidence of congressional intent may illuminate ambiguous text'"). In this case, that history provides illuminating answers.

## B

In the House and Senate Reports accompanying the 1970 FUTA amendments, Congress signaled that it designed the §3309(b)(1)(B) exemption to distinguish between church-related organizations performing ministerial functions (which it wanted to allow States to exempt) and those performing general charitable functions (which it wanted to require States to cover). This makes clear that *what* the entity does matters for purposes of applying the exemption.

To explain this, Congress included a series of examples distinguishing the kinds of church-run entities it thought were exemptible. On the exempt side of the line, the Reports list (1) a "college devoted primarily to preparing students for the ministry," (2) "a novitiate," and (3) "a house of study training candidates to become members of religious orders." H. R. Rep., at 44; S. Rep. No. 91–752, pp. 48–49 (1970) (S. Rep.). On the nonexempt side of the line, the Reports state that "a church related (separately incorporated) charitable organization (such as, for example, an orphanage or a home for the aged) would not be considered under this paragraph to be operated primarily for religious purposes." H. R. Rep., at 44; S. Rep., at 49. Nowhere does Congress mention *how*, much less *why*, these paradigmatic entities go about their work.

These examples are instructive. The exempt category as the Reports defined it lists solely church-run nonprofits that have service to the church itself as their main objective. A novitiate, for instance, is an entity that trains and houses novices who are deciding whether to pursue a life in a religious order or priesthood. Indeed, what unites all three "exempt" entities is *what* they do: preparing people

for religious life and for service to the church, *i.e.*, they all
serve religious functions. By contrast, the nonexempt cate-
gory consists of general charitable organizations affiliated
with a church. A church-related "orphanage" or "home for
the aged" is *not* "operated primarily for religious pur-
poses"—at least within the meaning Congress intended
that phrase to carry. H. R. Rep., at 44; S. Rep., at 49.

Through the Reports' examples, Congress thus clarified
that it does not matter *how* or *why* the entity goes about its
work. All that matters is *what* it does. As such, orphan-
ages, nursing homes, and charities like them—*i.e.*, entities
whose "purpose" is to care for children or tend to the el-
derly—do not exhibit what Congress considered to be "reli-
gious purposes" under this exemption. And that is true re-
gardless of whether religion motivates the entity's work.

## III

This function-based reading of "operated primarily for re-
ligious purposes" not only follows from the text and legisla-
tive history of §3309(b)(1)(B). It also best accords with the
anti-entanglement justification for the religious-purposes
exemption. Wisconsin maintains that it adopted its state
version of §3309(b)(1)(B) to keep the government out of un-
employment-eligibility adjudications that implicate ques-
tions of church doctrine. See Brief for Respondents 21–24.
But a reading of the exemption that requires assessment of
the entity's motivations, instead of its actual work, does lit-
tle to further that anti-entanglement objective.

Consider the state unemployment-insurance scheme at
issue here. Unemployed workers are not automatically eli-
gible to receive unemployment benefits; those who have
been terminated for "misconduct," for example, may be in-
eligible. Wis. Stat. §108.04(5). Employers can therefore ob-
ject to any worker's unemployment claim on misconduct
grounds. See §108.09(1). When that happens, the State's
unemployment agency must then decide whether to deny

benefits by considering the circumstances of the unemployment-benefit applicant's discharge.

For certain church-related employers—*e.g.*, novitiates, houses of study, and colleges that train ministers—that assessment might "entangl[e] the state in employment disputes that turn on religious faith and doctrine." Brief for Respondents 12. Imagine, for example, the adjudication of disputes over the sufficiency of a fired employee's prayers or the accuracy of their scriptural teaching. Indeed, it is precisely because of *what* novitiates, houses of religious study, and ministerial training colleges do (prepare individuals for religious life) that potential entanglement problems occur. By contrast, when a church-run entity provides general charitable services to the public, the same kinds of entanglement issues are far less likely to arise.[2]

What is more, a motive-focused exemption inquiry presents potential entanglement problems of its own. If taken seriously as an eligibility requirement (as opposed to a rubberstamp for any organization that professes religious motives), it would require assessing whether an entity is *really* motivated primarily by religion—an intrusive exploration into the hearts and minds of those who run it. See Brief for United States as *Amicus Curiae* 19–21 (listing evidence courts might examine to assess a nonprofit's "true motivations"). Requiring courts to engage in the business of evaluating religious motivation is a sensitive endeavor. And

--------

[2] Consider a church-related hospital that employs hundreds of workers—"janitors, cooks, dining assistants, housekeepers, van drivers, technicians, maintenance workers, secretaries, x-ray technologists, groundskeepers, receptionists, orderlies, nurses, anesthesia aides, sonographers, medical aides, occupational therapy assistants, security officers"—the list goes on. Brief for Service Employees International Union et al. as *Amici Curiae* 6–7 (listing jobs that *amici*'s members perform at religiously affiliated nonprofits). While the hospital may have a wholly sincere, Christ-centered mission, its religious motivation has little if anything to do with whether adjudicating unemployment claims from this hospital's laid-off workers will entangle church and state.

here, it is unnecessary, because the church-affiliation prong already does that work.  It actually serves no rational objective, as the sincerity of an entity's religious motives has little if anything to do with the problem Congress sought to address.

\*    \*    \*

Church-related nonprofit employers care for the sick, feed the hungry, and improve the world in countless ways. Most do this—no doubt—for religious reasons.  All do this thanks to their employees' labor.  As I read §3309(b)(1)(B), evaluating whether a church-affiliated nonprofit "operate[s] primarily for religious purposes" is not a matter of assessing the sincerity or primacy of its religious motives. Instead, as with so many other interpretive issues, determining what the religious-purposes exemption means involves attempting to discern what Congress was trying to achieve.  Here, Congress sought to extend to most nonprofit workers the stability that unemployment insurance offers, while exempting a narrow category of church-affiliated entities most likely to cause significant entanglement problems for the unemployment system—precisely because their work involves preparing individuals for religious life. It is perfectly consistent with the opinion the Court hands down today for States to align their §3309(b)(1)(B)-based religious-purposes exemptions with Congress's true focus.